UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CHRISTI LE SWENSON, | 4:17-CV-04067-KES |
| Plaintiff, | |
| vs. | |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY; | REPORT AND RECOMMENDATION |
| Defendant. | |

**INTRODUCTION**

Plaintiff, Christi Le Swenson, seeks judicial review of the Commissioner's

final decision denying her application for disability insurance benefits under

Title II and supplemental security income under Title XVI of the Social Security

Act.[1] Ms. Swenson has filed a complaint and now moves for summary

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  In this case, Ms. Swenson filed her application for both types of benefits.  AR 218-210 and 220-228.  Her coverage status for SSD benefits expires on December 31, 2019.  AR 14.  In other words, in order to be entitled

judgment, requesting the court to reverse the Commissioner's final decision denying her disability benefits and to direct an award of benefits. Alternatively, Ms. Swenson requests the court remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b) and the October 16, 2014, standing order and order dated January 19, 2018 (Docket No. 19) of the Honorable Karen E. Schreier, United States District Judge. Based on the facts, law and analysis discussed in further detail below, this magistrate judge respectfully recommends granting Ms. Swenson's motion for summary judgment and reversing the decision of the Commissioner and remanding for further proceedings.

## FACTS

**A.    Overview of the Case[2]**

This action arises from plaintiff Christi Swenson's application for SSDI and SSI benefits filed 9/9/14, alleging disability since 7/6/14, due to post concussion syndrome, headaches, face, head and neck pain, and numbness in hands and feet. AR80, 218, 220, 247, 255, 260 (citations to the appeal record

---

to Title II benefits, Ms. Swenson must prove she is disabled on or before that date.

[2] The below recitation of the facts is taken from plaintiff's initial brief, with which the Commissioner largely did not take issue. Disputes of fact, or facts the Commissioner especially relies upon, are discussed at further length in the DISCUSSION section of this opinion.

will be cited by "AR" followed by the page or pages). Ms. Swenson's claim was denied initially and again upon reconsideration; Ms. Swenson requested an administrative hearing. AR116, 127, 133, 140.

Ms. Swenson's hearing was held on 7/25/16, where different counsel than her current lawyer represented her. AR54. When Ms. Swenson became unable to continue during the initial hearing it was stopped and later resumed on 10/6/16. AR42, 77-79. An unfavorable decision was issued on 12/16/16 by Administrative Law Judge Christel Ambuehl, ("ALJ"). AR11. At Step One of the evaluation, the ALJ found that Ms. Swenson had not engaged in substantial gainful activity since the 7/6/14 alleged onset of disability date. AR16.[3] At Step Two, the ALJ found that Ms. Swenson had severe impairments of marginal erosions of the metacarpophalangeal (MCP) joints, somatization disorder, conversion disorder, depression, and anxiety. AR17. With regard to the mental impairments, the ALJ found that Ms. Swenson had mild restrictions in activities of daily living, and moderate difficulty in maintaining concentration, persistence or pace. AR17-18. At Step 3 the ALJ found that Ms. Swenson did not have an impairment that meets one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1. AR 17.

---

[3] The Social Security regulations set forth a sequential method of evaluating disability claims. 20 CFR 404.1520(b); 20 CFR 416.920.  See Section B of the DISCUSSION section of this opinion for a more detailed discussion.

The ALJ determined that Ms. Swenson had residual functional capacity, ("RFC"), to perform the full range of work at all exertional levels, but had non-exertional limitations that included:

> the claimant can never climb ropes, ladders, or scaffold. The claimant can frequently handle, finger, and feel bilaterally. The claimant should never be exposed to unprotected heights, dangerous machinery, or moving mechanical parts. The claimant is able to understand, remember, and carry out simple tasks, is limited to simple work related decisions, and is limited to tolerating the changes in a routine work setting.

AR19. The ALJ found that Ms. Swenson's allegations regarding intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence "for the reasons explained in this decision." AR22. Based on this RFC, the ALJ determined at Step Four that Ms. Swenson had carried her burden to show she was not capable of performing her past relevant work as a teacher, or hospital admissions clerk. AR24-25.

At Step 5 relying on the testimony of a vocational expert ("VE") the ALJ found that Ms. Swenson could perform the occupations of cashier II, inspector packager, and housekeeping cleaner. AR26. Ms. Swenson timely requested review by the Appeals Council, and it denied review making the ALJ's decision final. AR1. Ms. Swenson then timely filed this action.

**B.    Plaintiff's Age, Education and Work Experience**

Ms. Swenson was born 7/24/58, making her within a few days of 56 years old at the time of her alleged onset of disability (7/6/14) and 58 years old at the time of the decision, an individual of advanced age. AR240; 20 CFR Part

404, Subpart P, App 2 §201.00(g) and (f). The disability report indicated that Ms. Swenson completed four years of college in 1980. AR248. The ALJ found that Ms. Swenson's past relevant work consisted of teaching jobs and work as a hospital admissions clerk. AR24-25.

## C.    Relevant Medical Evidence

### 1.    Avera McKennan Hospital

The earliest treatment record in the appeal file was from the Avera emergency room when Ms. Swenson was seen on 7/6/14 following a trip and fall, landing on her face on the concrete. AR329. A facial bone CT showed a nasal bone fracture, right and left, and an old fracture of the inferior wall of the left orbit. AR330. The CT also showed multilevel degenerative disc disease and facet arthropathy with severe upper cervical facet arthropathy and osseous facet joint fusion at two levels on the left. AR334. The diagnoses were closed head injury, nasal bone fracture, laceration, and epistaxis, resolved. AR330.

Ms. Swenson presented to the emergency room again on 8/8/14 complaining of persistent intermittent headaches since the prior fall injury. AR318. She also reported intermittent difficulty concentrating, and at times feeling foggy, nauseous, and the fogginess and confusion had increased the prior night with a more severe headache. AR318. Ms. Swenson was found to have no neuro deficits, a head CT was negative and postconcussion syndrome was diagnosed. AR319.

### 2.    Avera McGreevy Clinic

Ms. Swenson was seen at McGreevy Clinic on 7/8/14 by Dr. Knutson to establish care and follow up after her fall injury. AR364. She reported a constant headache since the injury that got worse with exertion, and she was having trouble concentrating. AR364. Dr. Knutson also noted that Ms. Swenson had been diagnosed with IBS,[4] was complaining of right knee pain, and had RA,[5] so her methotrexate was refilled. AR364, 367. Dr. Knutson instructed her to avoid heavy thinking to let the brain heal, and to avoid exercise or exertion that worsened her headache. AR366.

Ms. Swenson saw Dr. Knutson on 7/11/14 to have her nasal stitches removed and reported she had been in the emergency room the night before due to a bloody nose, and she felt light-headed, weak, and fatigued. AR361. Examination showed Ms. Swenson was not anemic, so was likely post concussive and she should rest, both physically and mentally. AR363.

Ms. Swenson was seen by Dr. Knutson on 7/29/14 complaining of worsening headaches. AR357. She reported the headaches occurred 1-2 hours after trying to do certain things like using a computer, and her medications did not help. AR357. She had to go to a dark quiet room, and she also complained of continued fatigue. AR357. Ms. Swenson reported that a few years earlier she had been thrown from a horse and suffered a severe concussion and recovery

---

[4] This reference is not explained by either party.  The court takes the acronym to mean "irritable bowel syndrome."

[5] Later references make clear this is "rheumatoid arthritis."

6

had taken nearly two years. AR357. The assessment was nasal fracture healing well, and post concussive syndrome. AR359. Dr. Knutson prescribed rest and not to exert herself physically or mentally to the point of worsening symptoms. AR359. Dr. Knutson noted his concern for a long recovery this time with her prior history of concussion and long recovery. AR359.

On 8/8/14 Ms. Swenson's son contacted the clinic and requested a referral to a neurologist due to ongoing headaches and Ms. Swenson feeling in a daze at times. AR371. A referral was given to Dr. Jeffrey Boyle at Neurology Associates. AR372.

Ms. Swenson requested a letter documenting her concussion, post concussion status and inability to work which Dr. Knutson provided on 9/16/14. AR370.

Ms. Swenson saw Dr. Knutson on 10/16/14 for her post concussive syndrome with ongoing symptoms, and Dr. Knutson recommended rest, but that she also needed to get out and about to help prevent any depression. AR515.

Ms. Swenson saw Dr. Knutson on 3/23/15 for follow up of her post concussive syndrome and was still unsteady on her feet, unable to able to drive or function normally, having daily headaches, neck pain, dizziness, fatigue, light and sound sensitivity, fuzzy thinking, and pain in her face. AR509. She had been taking amitriptyline for the headaches, which helped a little bit, and the dosage had recently been increased, but she was then feeling a little hung over in the mornings. AR509. Her neurologist had recommended a free trial

eyegraine evaluation, which Ms. Swenson was resistant to having done. AR513.
Dr. Knutson thought she should do it since it was a "No lose situation, as it is
a free trial." But, he stated he still felt her symptoms were likely a post
concussive problem. AR513.

Ms. Swenson saw Dr. Knutson on 4/15/15 again to follow up on her
post concussive syndrome, and although she reported continued daily
headaches, she had seen some gradual slow improvement. AR503. She
reported she continued to be unsteady when walking, and could do very little
during the day without making her headaches worse. AR503. She told
Dr. Knutson that she did not want to see Dr. Boyle, the neurologist, again.
AR503. Ms. Swenson was referred to neurologist, Eugenio Matos, MD. AR507.

Ms. Swenson saw Dr. Andrea Miller on 7/15/15 for a well woman exam.
Her post concussive syndrome was not addressed in detail, but Ms. Swenson
did ask about over the counter medications for headaches, and she was
cautioned about medication overuse regarding headaches. AR501.
Ms. Swenson also requested a handicap permit renewal, which Dr. Miller
provided. AR501.

Ms. Swenson saw Dr. Knutson on 8/28/15 and reported that her feet
were no longer getting numb, and it was not feeling like someone was pushing
on her head, but she still had a page and a half's worth of symptoms that
Dr. Knutson stated would be scanned into the computer. AR482. The scanned
pages do not appear in the appeal record. Dr. Knutson's assessment was

chronic headaches and he stated Ms. Swenson was not able to work due to chronic headaches and post concussive syndrome. AR486.

On 10/26/15 Ms. Swenson contacted Dr. Knutson's office and stated she was crying a lot and wondered if it was a symptom of her post concussive syndrome, and Dr. Knutson told her it was typical after concussions. AR520. Ms. Swenson saw Dr. Knutson on 6/30/16 and she had seen numerous specialists for her post concussive syndrome, had tried occupational therapy and was taking duloxentine (Cymbalta), which she felt helped a bit. AR476. She reported good days and bad, and when she stressed her brain, mostly through thinking, her symptoms worsened, and they also worsened with physical exertion. AR476. Ms. Swenson requested a temporary handicap permit, and Dr. Knutson stated he was happy to provide it. AR476. Dr. Knutson encouraged her to manage stress and to continue to rest whenever she felt her symptoms were exacerbated. AR480.

Dr. Knutson responded to an attorney inquiry dated 7/11/16 related to her fall injury on 7/6/14 and responded that Ms. Swenson had post concussive syndrome due to the fall injury, and that since the injury she had been unable to return to work, and he was unsure if she would be able to return to work if she did not improve. AR519, 530.

Ms. Swenson saw Dr. Knutson on 7/19/16 to complete disability paperwork. AR471. Dr. Knutson completed a Headache Questionnaire and Physician's Statement in which he stated that Ms. Swenson had headaches, nausea, facial neuropathy, and dizziness due to post concussive syndrome.

AR491. Her symptoms included vertigo, nausea, malaise, photosensitivity, visual difficulties, mood changes, and mental confusion/inability to concentrate. AR491. Dr. Knutson stated Ms. Swenson had daily headaches that worsened by evening. AR491. Dr. Knutson identified weight loss, tenderness, impaired sleep, and MRI and CT scan results as objective signs of her headaches, and indicated that they were caused by her prior head injury. AR492. Dr. Knutson stated that Ms. Swenson was not a malingerer, emotional factors did not make the headaches worse, and her prognosis was poor. AR493. Dr. Knutson stated that Ms. Swenson's headaches had lasted at least twelve months, while having a headache she would be precluded from performing even basic work functions, and that her headaches caused "good days" and "bad days." AR493. Dr. Knutson indicated that he felt Ms. Swenson's headaches would cause absences from work more than four days per month. AR493.

Ms. Swenson contacted Dr. Knutson's office on 8/16/16 to request a prescription for a walker with a seat to use when she goes out and gets tired of standing/walking, and Dr. Knutson provided the prescription. AR519.

Dr. Knutson responded to an additional inquiry regarding Ms. Swenson's work limitations on 2/16/17 and indicated that Ms. Swenson had impairments which limited the use of her hands on a repetitive basis, and that during an 8-hour work day on a continuing basis she could not use her hands to handle or finger on a "frequent" basis with "frequent" defined as up to 2/3 of the 8-hour workday. AR546. Dr. Knutson also indicated that during an 8-hour work day

on a continuing basis Ms. Swenson could not lift 50 pounds on an "occasional" basis with "occasional" defined as up to 1/3 of the 8-hour workday nor could she lift 25 pounds on a "frequent" basis with "frequent" defined as up to 2/3 of the 8-hour workday. AR546. Dr. Knutson indicated that these work limitations had existed since 7/6/14. AR546.

### 3.    Neurology Associates

Ms. Swenson was seen by Dr. Boyle on 8/22/14 for her headaches following her fall injury. AR341. She reported daily throbbing headaches starting in the morning and worsening through the day, with light and sound worsening symptoms, but not triggering her headaches, some nausea, tearing, and rhinorrhea, radiation of the headache pain to her neck, and occasional tender points on the back of her head. AR341. Ms. Swenson also reported bilateral hand numbness since her fall with her left hand no longer numb, but her entire right hand was still numb showing a 50% decrement of pinprick sensation. AR341.

Ms. Swenson reported that she was mostly in bed during the day, rarely left the house, and when she did she required additional sleep later in the day. AR341. The "Headache Impact Test" score was 75 indicating very severe.[6] AR341. The examination was unremarkable, except 50% loss of enteric sensation in the entire right hand at the wrist. AR343. An MRI of the head and

---

[6] The Headache Impact Test assesses the impact of chronic headaches on a person's life with a score above 60 being very severe and 78 being the maximum score. *See* http://www.bash.org.uk/wp-content/uploads/2012/07/English.pdf, last checked February 12, 2018.

neck and an EMG of the right upper extremity was planned, and amitriptyline prescribed. AR344.

The EMG was normal showing no convincing evidence of a significant cervical radiculopathy, brachial plexopathy, upper extremity entrapment neuropathy, systemic peripheral neuropathy, or ganglionopathy. AR345. The brain MRI obtained on 9/19/14 revealed mild nonspecific nonenhancing white matter changes most suggestive for small vessel ischemic change with no evidence of infarct, hemorrhage, or mass effect. AR337, 351. The cervical MRI revealed mild multilevel degenerative spondylosis and facet arthropathy with no significant central or lateral foraminal stenosis, or spinal cord or nerve root impingement. AR338, 352.

Ms. Swenson saw Dr. Boyle for follow up on 11/24/14 with ongoing symptoms. The amitriptyline was helping with the headaches, but causing nausea. AR386. She complained of lightheadedness, heat intolerance, and palpitations, which were occurring primarily when she stood up. AR386. Ms. Swenson's headaches were worse when riding in the car at night and looking at bright headlights in the darkness, and when looking at computer screens. AR386. Dr. Boyle also discussed Ms. Swenson's problems with her mood and Ms. Swenson became tearful; she felt confined to her home and isolated with her symptoms. AR386. Dr. Boyle felt Ms. Swenson's headaches had a component of trigeminal neuralgia, and noted Ms. Swenson also had fatigue, headaches and dysethesias. AR388. Dr. Boyle noted that Ms. Swenson was interested in an evaluation for POTS syndrome and noted she had some

12

symptoms concerning for eyegraines. AR388. Carbamazepine was prescribed, amitriptyline tapered off, and autonomic nervous system testing was planned. AR388-9. Dr. Boyle also stated to consider SightSync testing. AR389.

Ms. Swenson saw Dr. Boyle again on 3/17/15 and continued to have severe post concussive headaches with episodes of fatigue, headaches, dysesthesias diaphoresis, palpitations, and lightheadedness upon standing, and she also reported symptoms of presyncope. AR392. Many of her symptoms were exacerbated by both mental and physical activity. AR392. Trigger point injections were considered but Ms. Swenson declined, and the carbamazepine had been stopped and amitriptyline restarted because it did improve the severity of the headaches. AR392. When she had breakthrough headaches she had to lie down, and she was frustrated with her symptoms, which often led to worsening anxiety and depression. AR392.

Ms. Swenson brought Dr. Boyle a list of her symptoms which included: headache, pain in the face, neck pain, back pain, sore spots on head (aching and episodic), hands numb, eyelids swelled and sore, lightheaded or dizzy, shaky, perception off, tired, exhausted, hot, sweating, chills, weak, nauseous, vomit, light sensitive, sound sensitive, fuzzy thinking, nervous, head feels pushed down, shoulders feel pushed down, head throbbing, shooting head pain, feels like face on fire, her eyes water, frustrated, emotional, can use computer. AR392. Ms. Swenson's Headache Impact Test score had increased to 76. AR392. Ms. Swenson was not interested in the Eyegraine evaluation, but

Dr. Boyle felt she had the criteria for a diagnosis[7]. AR392. Dr. Boyle's planned treatment included a complete balance evaluation, an event monitor, a disability parking pass, and increased dosage of amitriptyline. AR395.

### 4.    Sanford Hospital Outpatient Therapy

Ms. Swenson was seen for outpatient occupational therapy starting on 3/18/16 for her post concussion with dizziness, headaches, cognitive disorder, and decreased balance. AR421. A visual motor assessment revealed increased pounding in her head with oculomotor range of motion, increased headache intensity with visual attention, increased difficulty with right to left saccades, increased dizziness with vestibuloocular reflex head movement to the left, loss of center gaze and more difficulty moving to the left, increased difficulty and loss of gaze with head movement to the left and object moving to the right, and more difficulty and errors completing a random complex circle with symbols search. AR422-3. Invision testing revealed impaired dynamic visual acuity in the horizontal plane that was inadequate for normal functional activity. AR423. Ms. Swenson's headache intensity increased during the Invision testing to 8/10 with increased dizziness. AR423. Ms. Swenson was considered a fall risk and had good rehabilitation potential for her decreased visual perceptual skills,

---

[7] Dr. Boyle worked at Neurology Associates which was working on a new treatment for eyegraine headaches, a "newfound class of headaches" with a Mitchell, SD Optometrist.
See http://www.prairiebusinessmagazine.com/health-care/3969534-sd-headache-centerhas-new-technology-help-people-suffering-chronic-headaches. (April 16, 2014 press release), last checked February 12, 2018.

headaches, dizziness and decreased independence with ADL and IADL tasks. AR423.

Ms. Swenson attended nine occupational therapy sessions along with home exercises between 3/22/16 and 5/12/16. AR426-454. Ms. Swenson's last two sessions were cancelled and she met with Dr. Susan Assam[8] who discharged her from therapy because Ms. Swenson felt she could do her own home exercise program. At the last session on 5/12/16 Ms. Swenson continued to have problems, and had met only one of three short-term and two of four long-term therapy goals. AR453.

### 5.    Sanford Neurology Clinic:

Ms. Swenson was seen by neurologist, Eugenio Matos, MD on 6/3/15 and reported continuing daily headaches and similar related ongoing symptoms, including the list of symptoms previously provided to Dr. Boyle. AR456. Examination showed somewhat limited movement of the neck, Romberg test which was normal, but somewhat unsteady with a somewhat unusual reaction by Ms. Swenson to the unsteadiness, and only fair tandem gait with a tendency to fall in any direction, and was otherwise normal. AR457. Dr. Matos' impression was closed head injury, post-concussion syndrome with headaches, dizziness and multiple other symptoms, and a normal neurological

---

[8] Dr. Assam was identified by Ms. Swenson as a treatment provider prior to the hearing, (AR310), Dr. Assam was listed as the referring physician for these therapy records, (AR424, 452), and Dr. Assam was also the referring physician for Ms. Swenson's evaluation by Dr. Konrady, (AR536). Ms. Swenson also testified at her hearing that Dr. Assam was her treatment provider for her headaches, (AR64).  However, none of Dr. Assam's treatment records appear in the appeal record, and there is no evidence in the file that they were requested.

exam, except noted balance issues. AR457. Gabapentin was prescribed, along with a physical therapy evaluation for the balance issues, and repeat CT of the brain, cervical MRI, and magnetic resonance venogram. AR457.

A video electronystagmography study performed on 6/4/15 due to vertigo and disequilibrium was normal. AR410. If any of the other tests were performed the results were not included in the appeal record.

### 6. Sanford Psychiatry & Psychology Clinic

Ms. Swenson was seen by behavioral specialist, Kelly Lauck, PhD, LPC-MH, NCC, on 3/3/16 for post concussion syndrome, depression, and anxiety. AR459. Ms. Swenson's mental status exam showed her mood and affect was labile, concentration was brief, motor activity restless, and was otherwise good or normal. AR459. Ms. Swenson continued to have daily headaches, and provided Dr. Lauck her list of other ongoing symptoms. AR459. Ms. Swenson reported her mood is good except when she started to feel down, anxiety with crying or becoming tearful for no reason, feelings of worthlessness and guilt, difficulty concentrating and focusing, feelings of helplessness, difficulty attending a church service due to the noise and movement, prior suicidal thoughts right after the accident, and difficulty reading because it wears her out. AR461-2. Ms. Swenson was referred to Barb Wendell-Schechter for medication management, and she declined individual counseling until she felt better. AR462. Dr. Lauck's assessments included adjustment disorder with depressed mood and anxiety and postconcussion. AR462.

16

Ms. Swenson saw psychologist, Dr. Rhonda Smith on 3/22/16 for behavioral health psychology testing, including the Minnesota Multiphasic Personality Inventory, (MMPI-2). AR463. Dr. Smith noted that Ms. Swenson claimed to be unrealistically virtuous responding to the MMPI-2, which weakens validity and may show an unwillingness or inability to disclose information. AR463. Dr. Smith noted that despite extreme defensiveness Ms. Swenson's responses reflected some unusual symptoms or beliefs. AR463. Ms. Swenson presented a mixed pattern of symptoms in which somatic reactivity under stress was a primary difficulty. AR463. She presented a picture of physical problems and a reduced level of psychological functioning, and she was likely to have a hysteroid adjustment to life and may experience periods of exacerbated symptom development under stress, and some individuals with this profile develop patterns of "invalidism" in which they become incapacitated and dependent on others. AR463. Her physical complaints may be vague, have suddenly appeared after a period of stress, may not be traceable to actual organic causes, and may manifest fatigue, vague pain, weakness, and unexplained periods of dizziness. AR463. They may appear virtuous and are not greatly anxious or depressed about their  symptoms. AR463. They manage conflict by excessive denial and repression.  AR464.

Following testing and exam, Dr. Smith's assessments were:  rule out conversion disorder, rule out somatization disorder and dependent personality disorder. AR464. Dr. Smith noted that persons with this profile are likely resistant to mental health treatment because of little psychological insight and

17

wanting medical explanations for their disorder. AR464. They may be defensive and reluctant to engage in self-exploration and she felt Ms. Swenson seemed to experience little anxiety over her situation and may have little motivation to change her behavior. AR464. Individuals with this profile likely require long-term commitment to therapy; however they will often terminate treatment early. AR464.

Ms. Swenson saw psychiatrist, Dr. Rajesh Singh, on 3/31/16 in a follow up to his initial intake exam. AR466. Dr. Singh reviewed the NeuroTrax, results which did not show any significant cognitive impairment, with Ms. Swenson, and her MMPI-2 results. AR466. Dr. Singh discussed somatization versus conversion disorder with Ms. Swenson and she became very tearful and dysphoric, and Dr. Singh felt there was a component of underlying anxiety. AR466. Ms. Swenson was already scheduled for detailed neuropsychiatric testing, and he prescribed Cymbalta. AR466. Dr. Singh's assessment was somatization disorder versus conversion disorder[9]. AR466.

Ms. Swenson saw psychologist, Dr. Sarah Konrady, for a neuropsychological evaluation and testing on 7/15/16. AR536. Dr. Konrady conducted a one hour clinical interview and administered the Wechsler IQ test, Wechsler memory test, Delis-Kaplan executive function test, and the Test of Validity. AR536. Dr. Konrady noted that adjustments were made to lighting due to Ms. Swenson's sensitivity during testing, that Ms. Swenson was

---

[9] Somatoform symptom disorder and conversion disorder are discussed at greater length in Section E(2)(a) of the DISCUSSION section of this opinion.

observed to hold onto walls when walking to the bathroom, and she was observed to complete some tasks slowly, which seemed somewhat intentional in an effort to complete tasks slowly or with more care than necessary. AR538. Dr. Konrady observed some anxiety but felt the results were a valid estimation of her current level of function, and all validity checks were normal. AR538. Ms. Swenson's IQ tests all fell in the average range, except processing speed, which was low average. AR539. Ms. Swenson's memory test scores all fell in the lower end of average, which indicated that Ms. Swenson was performing at a lower than expected rate regarding memory given her cognitive ability. AR540.

Dr. Konrady's assessment was that Ms. Swenson had average cognitive ability, mild memory impairments, and the Delis-Kaplan executive function test showed weak visual scanning and slow processing speeds for visual tasks. AR542. Dr. Konrady found the weak scanning and slow processing to be consistent throughout the process, but the results indicated she sacrificed speed for accuracy. AR542. Dr. Konrady felt Ms. Swenson's results were probably negatively impacted by mental fatigue, Ms. Swenson's light sensitivity negatively impacted her ability to complete tasks via electronic means, and her visual concerns seemed equally problematic with her ability to complete tasks requiring focus, concentration, and prolonged attention. AR542. Based on the self report of these complaints in combination with mild difficulties in processing speed and memory function, Dr. Konrady felt Ms. Swenson met the

criteria for a mild cognitive impairment. AR542-3. Her assessments were anxiety and depression and mild cognitive impairment. AR543.

Dr. Konrady also noted Ms. Swenson's prior psychological testing and the concern for conversion versus somatization disorder, and that she was seeing Barb Wendell-Schechter for psychiatric care of anxiety and depression[10]. Dr. Konrady stated in her conclusion that "the possibility of somatization or conversion disorder must be considered, and behavioral observations made during testing would support, rather than oppose, those concerns," noting seemingly exaggerated slow completion attempts on simple tasks, and inconsistent dependence on walls for balance while walking. AR543.

Dr. Konrady stated that based on the objective results Ms. Swenson's "ability to engage in employment is fair given her cognitive ability, with some modifications likely necessary based on weaknesses identified today." AR543.

Dr. Konrady noted the following modifications or limitations:

1. Position which does not require quick response

2. Position which does not require fast paced completion of tasks

3. She would struggle with tasks requiring multistep directions or multitasking

4. Position where she could start off slowly (reduced hours/day) and monitor her success

---

[10] There are no treatment records from Barb Wendell-Schechter in the appeal record.

AR543. Dr. Konrady recommended continued treatment for any mental health concerns, including anxiety, depression, and possibly somatization concerns. AR543.

### 7.    State Agency Physical RFC Assessments

The state agency physicians completed two assessments of Ms. Swenson's physical limitations. At the initial level the agency expert on 11/17/14 found that Ms. Swenson had severe cerebral trauma, but concluded, "Expect durationally non-severe based on limited obj abnls." AR85-6, 94-5. No physical RFC assessment was completed. Id. The reconsideration state agency physician made the exact same impairment finding and conclusion on 4/7/15. AR103-4, 112-3. Again, the expert did not complete a physical RFC assessment. Id.

### 8.    State Agency Mental Assessments

The state agency expert at the initial level on 10/16/14 found that there were no psychiatric diagnoses in the medical evidence he reviewed. AR86, 95. No mental RFC assessment was completed. AR86, 95.

The reconsideration level expert on 3/24/15 made the exact same findings that there were no psychiatric diagnoses in the medical evidence he reviewed. AR104, 113. No mental RFC assessment was completed. AR104, 113.

The medical evidence from Sanford Neurology Clinic, Sanford Psychiatry and Psychology Clinic, including the neuropsychology and testing performed by Dr. Smith and Dr. Konrady were not in the file at the time of the state agency review at either level. AR100-102.

21

**D.    Summary of Testimony at the ALJ Hearing**

**1.    Ms. Swenson's Testimony:**

Ms. Swenson appeared at her first hearing on 7/25/16. AR54.

Ms. Swenson testified that she lived with her husband and her adult son.

AR58. She testified that she was still receiving some teaching income after her

onset date of 7/6/14 because she was paid on a 12-month contract. AR59. She

testified that she had a driver's license, but had not driven since the accident

on 7/6/14, because she did not comprehend things. AR60.

When asked why she could not work Ms. Swenson testified that she

could not think very fast and gets physically exhausted. AR62. She explained

the more tired she gets the harder it is to remember things and she gets

horrible headaches, dizziness and nausea, and other physical symptoms.

AR63. Ms. Swenson said she had those problems pretty much daily and gave

examples of not being able to handle driving, not getting jokes, not keeping

track of things, and forgetting how to do things like the button to turn off the

TV. AR63. She said she had problems with attention and concentration and

can't think through things real well. AR70. Ms. Swenson testified she probably

spends about seven or eight hours per day lying down due to headaches,

fatigue and dizziness, depending on how bad her headaches are. AR71-2.

Ms. Swenson testified that she gets daily headaches which get worse by

evening or if she does too much. AR63. She said the headaches are usually 2 to

9/10 pain level with 2/10 pain level in the morning and get gradually worse,

and if they get really bad she had to go to her room, make it dark, and get over

the headache. AR64. Ms. Swenson testified she took medication for her headaches twice per day prescribed by Dr. Assam who was her treatment provider for her headaches, and it seemed to help. AR64. She said she had tried other medications, but they did not help. AR65.

Ms. Swenson testified that she also could not work because of tiredness, hand numbness, and fatigue. AR65. She said her feet used to also get numb, but not any more. AR65. Ms. Swenson said her left hand gets numb almost daily, and her right hand a couple of times per week, so she had a hard time hanging on to things or writing. AR66.

Ms. Swenson said she could lift 5-10 pounds and could lift a 24 pack of soda, but couldn't carry it very far. AR66. She said her ability to stand in one place was limited to a couple of minutes because she gets dizzy. AR66. Ms. Swenson said she walked the other day down two driveways and it took her about 20 minutes, she also could sit, but if she sat for very long she would start getting a headache. AR67.

Ms. Swenson testified that her husband or son did most of the cleaning and shopping, that she watched church on TV because it's too loud in person, and she could not watch movies or use the computer, but could watch TV if the sound and brightness was turned down. AR69. She said using a computer made her head hurt really bad. AR69.

Ms. Swenson said she does some exercise leaning up against the wall for 5-10 minutes, and she had been trying a little walking, but Dr. Assam wanted her to have her walking stick or walker with her. AR70.

Ms. Swenson testified that Dr. Knutson was her family doctor and she

had been treating with him since the accident. AR73.

### 2.    Vocational Testimony:

The ALJ's first hypothetical was to assume an individual who was limited

as follows:

> never climb ladders, ropes, or scaffolds. Should not be exposed to
> unprotected heights or dangerous machinery. Would be limited to
> frequent, but not constant handling, fingering, and feeling. The
> individual's able to understand, remember, and carry out simple
> tasks. Is limited to simple, work related decisions. Limited to
> tolerating changes in a simple work setting.

AR75-6. The VE testified that the individual could not do Ms. Swenson's past

work, because what the ALJ was describing was more compatible with

unskilled work, but could perform the unskilled jobs of cashier II, inspector

packager, and stock checker, AR76-7.

At that point in the hearing the record indicated that Ms. Swenson's

attorney stated that the hearing would have to be put on hold because

Ms. Swenson was not well enough to continue. AR77. There is no response or

any further input from the ALJ—no explanation of what happened, no

statement that the hearing is being suspended or anything else. AR77-9.

Apparently the ALJ just left the room. AR78.

The hearing resumed via videoconference on 10/6/16, and again the ALJ

gave no explanation on the record of what had happened to cause the prior

hearing to end prematurely other than noting this was a "supplemental"

hearing because the VE did not get to complete his testimony at the first

hearing. AR44- 5.

The ALJ asked the VE the same hypothetical again and the VE gave similar testimony, except that the other occupations he identified included housekeeping cleaner instead of stock checker this time. AR46-7.

The ALJ asked the impact of limiting the individual to goal oriented work instead of production pace work and the VE testified that would eliminate the inspector packager occupation, but the individual could perform the occupation of dock checker. AR48.

The VE testified that an individual would only be allowed one absence per month and if they exceeded that there would be no jobs. AR50. The VE also testified that the mental limits included in the hypothetical question would not allow for any transferable skills to any light or sedentary occupation, and that if the individual were limited to occasional handling and feeling it would eliminate all the occupations he had identified. AR51.

### E.    Post-Hearing Evidence

Prior to the hearing the ALJ asked Ms. Swenson to complete a Social Security form identifying her recent medical treatment. On that form Ms. Swenson informed the ALJ she had received recent treatment from Dr. Knutson, and also treatment from Bruce Schultz at Sanford Clinic on North Sycamore, Susan Assam a physician at Sanford Physical Medicine and Rehabilitation Clinic, Rajesh Singh a psychiatrist, and Eugenio Matos, a neurologist. AR310. Despite Ms. Swenson identifying these treatment providers it does not appear that all of their treatment records were included in the

record. In another form requested by the ALJ, Ms. Swenson identified that she was taking Duloxetine prescribed by Dr. Assam for her headaches. AR311.

**F.     Issues Before This Court**

Ms. Swenson raises three assignments of error before this court:

1.     The ALJ erred in identifying Ms. Swenson's severe impairments at step two.

2.     The ALJ's formulation of Ms. Swenson's RFC was not supported by substantial evidence.

3.     The ALJ erred in evaluating Ms. Swenson's credibility.

Ms. Swenson requests this court to reverse and remand with instructions to the Commissioner to award disability benefits or, in the alternative, to remand for reconsideration of the issues and further development of the record.  The Commissioner requests this court to affirm its decision below.

## DISCUSSION

**A.     Standard of Review.**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely

a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Woolf v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311. Where "[s]everal errors and uncertainties in the opinion [occur],

that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying" benefits, remand for further proceedings before the agency is warranted. Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008).

**B.    The Disability Determination and the Five-Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[11] The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary.

---

[11] Although Ms. Swenson has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the Title XVI regulation is identical. It is understood that the provisions of both Titles are applicable to Ms. Swenson's application. Any divergence between the regulations for either Title will be noted.

<u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

> Step One:   Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

> Step Two: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

> Step Three: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  <u>Bartlett</u> 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

> Step Four: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows her to meet the physical and mental demands of her past work, she is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow her to meet the

physical and mental demands of her past work, the ALJ must
proceed to Step Five.

Step Five: Determine whether any substantial gainful activity
exists in the national economy which the applicant can perform.
To make this determination, the ALJ considers the applicant's
RFC, along with his age, education, and past work experience.  20
C.F.R. § 1520(f).

## C.    Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof

shifts to the Commissioner at step five.  Clark v. Shalala, 28 F.3d 828, 830 (8th

Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither

statutory nor regulatory, but instead, originates from judicial practices."

Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at step

five has also been referred to as "not statutory, but . . . a long standing judicial

gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir.

1987).  Moreover, "[t]he burden of persuasion to prove disability and to

demonstrate RFC remains on the claimant, even when the burden of

production shifts to the Commissioner at step five." Stormo v. Barnhart 377

F.3d 801, 806 (8th Cir. 2004).

## D.    Did the ALJ Err at Step Two?

Ms. Swenson argues the ALJ erred in determining Ms. Swenson's severe

impairments at step two of the analysis because the ALJ never considered her

asserted impairments of post-concussive syndrome and headaches.  The

Commissioner counters that this error was harmless because the ALJ's

analysis did not stop at step two, but rather went all the way to step five. At steps four and five, the Commissioner asserts, the ALJ properly considered these conditions in determining Ms. Swenson's RFC and what jobs she was capable of performing. Ms. Swenson asserts it was not harmless error because the ALJ also failed to consider these impairments at step four when determining her RFC.

Ms. Swenson alleged post-concussion syndrome and headaches as the basis for her disability when she initially applied for benefits. AR80, 218, 220, 247, 255, 260. She asserted debilitating headaches in her function reports that arose after being concussed (AR249, 252-53, 255, 260), and she testified to daily headaches at the hearing (AR63). At step two of the analysis, the ALJ found Ms. Swenson had the following medically determinable severe impairments: marginal erosions of the metacarpophalangeal joints, somatization disorder, conversion disorder, depression and anxiety. AR17. The ALJ never mentioned post-concussion syndrome or headaches at step two. Id. The ALJ did not evaluate these conditions and find them to be non-severe; she failed to discuss or acknowledge them at all. Id. The ALJ also failed to mention or evaluate post-concussion syndrome or headaches at step three, when evaluating the listings. AR17-19.

At step four, the ALJ stated Ms. Swenson alleged post-concussion symptoms as her disabling condition on her application (AR20), but the ALJ never mentioned that Ms. Swenson's allegation was substantiated by an actual diagnosis of post-concussion syndrome and closed head injury by Dr. Knutson.

31

AR20-24.  The ALJ went on to acknowledge that Ms. Swenson described "pain"
in her function reports, but never specified that this pain manifested as
headaches or that the pain was experienced daily.  AR20.  Describing
Ms. Swenson's hearing testimony, the ALJ characterized her testimony as "pain
in the head," experienced daily.  Id.  Still at step four, the ALJ turned to the
medical evidence and described it, but, again, never mentioned the post-
concussion syndrome diagnosis nor the headaches.  AR20-24.  Instead, the
ALJ reviewed the evidence pertaining to Ms. Swenson's diagnoses for
somatization disorder, conversion disorder, depression and anxiety.  Id.

On this record, the court cannot say that it was "harmless error" for the
ALJ to fail to consider whether post-concussion syndrome and headaches were
medically determinable severe impairments at step two.  It may be that the ALJ
determined Ms. Swenson's conversion disorder or somatization disorder were
the sole causes of her symptoms.  It is equally likely that the ALJ overlooked or
failed to consider the very conditions Ms. Swenson alleged were the bases of
her disability in her application.  As discussed in greater detail below,
diagnoses of somatoform symptom disorder and conversion disorder may
coexist with medical diagnoses of objectively verifiable conditions.  See
Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5")
at 309-10 (5th ed. 2013).  There is no clue in the ALJ's opinion as to which
circumstance occurred.  This court will not try to read the ALJ's mind or guess.
Instead, remand is warranted so that the ALJ can return to step two of the
analysis and determine whether post-concussion syndrome and headaches are

medically determinable severe impairments and then, at step three, whether those impairments meet or equal a listing.  Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007) (reversing where ALJ failed to consider claimant's borderline intellectual functioning at step two).

This case is distinguishable from Lorence v. Astrue, 691 F. Supp. 2d 1008 (D. Minn. Feb. 23, 2010), cited by the Commissioner to this court.  In Lorence, the ALJ did not consider the claimant's diagnosis of adrenal insufficiency at step two.  Lorence, 691 F. Supp. 2d at 1028.  The claimant argued the diagnosis provided objective evidence to explain her pain and fatigue.  Id.  The court found it was harmless error to have failed to consider the diagnosis at step two for two reasons:  (1) the ALJ properly considered the claimant's pain and fatigue when arriving at her RFC and (2) the record as a whole did not support claimant's argument that the adrenal insufficiency diagnosis in fact provided objective evidence to explain her pain and fatigue. Id.  In this regard, the court pointed out the claimant's complaints of pain and fatigue predated by many years the trigger point injections which caused the adrenal insufficiency, and pain and fatigue continued long after the adrenal insufficiency was resolved.  Id.  Nevertheless, although the court declined to reverse solely on this basis, it noted the ALJ should have considered whether adrenal insufficiency could have contributed to the claimant's symptoms.  Id. at 1028-29.  In Ms. Swenson's case, there is no evidence her symptoms predated her concussion, so the circumstance present in the Lorence case is not present here.

The Valley case is completely inapposite. In that case, the ALJ considered the claimant's alleged knee impairment at step two, but found it to be non-severe, a finding the claimant appealed. Valley v. Astrue, 2011 WL 5999260 at *2 (E.D. Ark. November 29, 2011). The ALJ, at step four, incorporated the claimant's non-severe knee impairment into the RFC formulation. Id. at *3. Thus, the Valley case does not involve a situation where the ALJ completely missed evaluating an impairment at step two, as the ALJ in Ms. Swenson's case did.

The Commissioner argues the ALJ did consider Ms. Swenson's headaches at steps four and five, suggesting that Ms. Swenson's headaches were controlled by her prescriptions for Hydrocodone and amitriptyline. If an impairment is controlled by medication, it is not disabling asserts the Commissioner. The problem with this argument is that Ms. Swenson continued to report daily disabling headaches even when she did take Hydrocodone and amitriptyline and these complaints continued right up to the time of the ALJ hearing. See AR392 (daily headaches, 3-17-15); AR509 (daily headaches while on amitriptyline, 3-23-15); AR503 (daily headaches while on increased dose of amitriptyline, 4-15-15); AR456 (daily headaches, 6-3-15); AR486 (chronic headaches, 8-28-15); AR421, 423 (daily headaches, 3-18-16); AR491-93 (daily headaches, 7-19-16). Therefore, contrary to the Commissioner's suggestion, Ms. Swenson's headaches did not go away when she took medication. The ALJ was under a duty to consider whether these headaches were disabling at step two, and beyond step two through step five.

34

Even non-severe impairments must be considered in combination with severe impairments when formulating a claimant's RFC.  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).

Because the ALJ failed to mention post-concussive syndrome or headaches and failed to evaluate those impairments at steps two and three, this court respectfully recommends this matter be remanded to the agency for a full consideration of those conditions at steps two through five.

Ms. Swenson also suggests the ALJ erred by failing to develop the record by requesting Dr. Susan Assam's treatment records, which were not before the agency.  The duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in social security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial.  Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.  The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing.  The ALJ posses no interest in denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted).  See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel).  If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification.  McCoy v.

Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  However, this is true only for "crucial" issues.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

It may well have been error here for the ALJ to fail to request Dr. Assam's records.  The ALJ was on notice as to the relevance of these records to Ms. Swenson's headaches.  AR310, 424, 452, and 536.  However, this court does not recommend remand on this basis alone for two reasons: (1) Ms. Swenson's post concussive syndrome and headaches were well-established in the records that were already before the agency and (2) because remand is recommended, Ms. Swenson herself can introduce Dr. Assam's records when or if the case returns to the agency.

**E.    Did the ALJ Err in Formulating Ms. Swenson's RFC?**

**1.    The Law Applicable to Determination of RFC**

Ms. Swenson argues the ALJ erred in determining both her physical and mental RFC.  As to mental RFC, Ms. Swenson argues the ALJ failed to grasp the fundamental nature of her mental impairments.  As to physical RFC, Ms. Swenson argues the ALJ failed to account for the severe marginal erosions of her metacarpophalangeal joints, her post concussive syndrome, and her chronic headaches.  The Commissioner asserts the ALJ's formulation of Ms. Swenson's RFC is supported by substantial evidence in the record.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer, 245 F.3d at 703 (citations omitted, punctuation altered).  "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the

claimant's disability.  20 C.F.R. § 404.1545(b)."  <u>Cooks v. Colvin</u>, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (<i>en banc</i>), <u>abrogation on other grounds recognized in</u> <u>Higgins v. Apfel</u>, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere.  <u>Lauer</u>, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on <i>all</i> the relevant evidence . . . a claimant's residual functional capacity is a medical question."[12]  <u>Lauer</u>, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  <u>Id.</u> (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the

---

[12] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  <u>See</u> SSR 96-8p.

opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id.  "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8.  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p.  However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must

38

. . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered). RFC is not demonstrated by "the ability merely to lift weights occasionally in a doctor's office." Juszczyk v. Astrue, 542 F.3d 626, 633 (8th Cir. 2008). See also SSR 96-8p ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 2.    Application of the Law to the ALJ's Opinion

#### a.    Mental RFC

As stated above, the ALJ found Ms. Swenson had severe mental impairments of somatization disorder, conversion disorder, depression and anxiety. AR17. Based on those severe impairments, the ALJ found Ms. Swenson had the mental RFC as follows:

> The claimant is able to understand, remember, and carry out simple tasks, is limited to simple work related decisions, and is limited to tolerating the changes in a routine work setting.

AR19. Applying the "paragraph B" criteria, the ALJ found Ms. Swenson's mental impairments cause "mild" restrictions in activities of daily living and

"moderate" difficulties in maintaining concentration, persistence and pace.[13] AR17-18.

Ms. Swenson argues the ALJ misunderstood the very nature of her somatization and conversion disorders and, thus, made erroneous inferences from the raw medical data when formulating Ms. Swenson's mental RFC. Furthermore, she asserts the ALJ misapplied Dr. Konrady's opinion, which was an opinion regarding Ms. Swenson's cognitive abilities, not an opinion as to Ms. Swenson's somatization or conversion disorders.

The Commissioner's listing for somatic symptom and related disorders describes the condition as follows:

> a.    These disorders are characterized by physical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical condition, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience.  These disorders may also be characterized by a preoccupation with having or acquiring a serious medical condition that has not been identified or diagnosed.  Symptoms and signs may include, but are not limited to, pain and other abnormalities of sensation, gastrointestinal symptoms, fatigue, a high level of anxiety about personal health status, abnormal motor movement, pseudoseizures, and pseudoneurological symptoms, such as blindness or deafness.

> b.    Examples of disorders that we evaluate in this category include somatic symptom disorder, illness anxiety disorder, and conversion disorder.

See 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App.1, §§ 12.00(B)(6), 12.07.

---

[13] These criteria are found in the listings of mental disorders found at 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00E.

The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5") explains that somatic symptom disorder and conversion disorder are not exclusive of diagnosed (physical) medical disorders; instead, the two may co-exist. DSM-5, at 309-10 (5th ed. 2013). A patient may have a medical diagnosis and also a comorbid mental disorder of somatic or conversion disorder. Id. The disorders are diagnosed *not* solely on the basis of the absence of objective physical findings to explain symptoms. Id. Rather, the disorders are diagnosed on the basis of positive symptoms (distressing somatic symptoms plus abnormal thoughts, feelings, and behaviors in response to these symptoms). Id. However, medically unexplained symptoms are a key feature in the disorders "because it is possible to demonstrate definitively in such disorders that the symptoms are not consistent with medical pathophysiology." Id. at 310.

The diagnostic criteria for conversion disorder are:

- One or more symptoms of altered voluntary motor or sensory function

- Clinical findings provide evidence of incompatibility between the symptom and recognized neurological or medical conditions

- The symptom or deficit is not better explained by another medical or mental disorder

- The symptom or deficit causes clinically significant distress or impairment in social, occupational, or other important areas of functioning or warrants medical evaluation.

Id. at 318. Conversion disorder may be accompanied by symptoms of weakness or paralysis, abnormal movement, swallowing symptoms, attacks or

41

seizures, anesthesia or sensory loss, or with visual, olfactory or hearing

disturbances.  <u>Id.</u>

The diagnostic criteria for somatic symptom disorder are:

- One or more somatic symptoms that are distressing or result in significant disruption of daily life.

- Excessive thoughts, feelings, or behaviors related to the somatic symptoms or associated health concerns as manifested by at least one of the following:

    1. Disproportionate and persistent thoughts about the seriousness of one's symptoms

    2. Persistently high level of anxiety about health or symptoms

    3. Excessive time and energy devoted to these symptoms or health concerns

- Although any one somatic symptom may not be continuously present, the state of being symptomatic is persistent (typically more than 6 months).

<u>Id.</u> at 311.  Somatic symptom disorder may be accompanied with somatic

symptoms which predominantly involve pain.  <u>Id.</u>

It is clear that the ALJ in Ms. Swenson's case failed to grasp the nature

of her admittedly severe (found to be so at step two) somatic and conversion

disorders.  In evaluating the functional limitations posed by Ms. Swenson's

somatic and conversion disorders, the ALJ set forth Ms. Swenson's description

of her disabling symptoms.  AR20.  The ALJ then stated "however," the medical

evidence including a CT scan and neurologic evaluation were normal.  <u>Id.</u>  The

ALJ noted Ms. Swenson described disabling headaches that kept her in bed

most of the day, but then noted Dr. Boyle found normal neurologic evaluations,

normal physical exam, normal functional mental status, normal attention span

and concentration, accurate recollection, clear and articulate speech, and no confusion or delirium. AR20-21. The ALJ continued with a litany of "normal" medical tests in the record, even though Ms. Swenson's medical care providers had described her as tearful when discussing her problems, dysphoric, mildly anxious, and having a labile mood and affect. AR21.

By relying on "normal" medical findings to debunk Ms. Swenson's description of her pain and functional limitations and formulate her mental RFC, the ALJ completely misconstrued the nature of her mental diagnoses. The absence of clinical findings to support the claimed symptoms are a key requirement of the diagnoses of somatic symptom disorder or conversion disorder. Like the ALJ in Nowling v. Colvin, 813 F.3d 1110 (8th Cir. 2016), the ALJ misunderstood the nature of the mental disorder and, therefore, mistook the significance of the medical evidence before her.

In Nowling, the claimant suffered from non-epileptic pseudo-seizures, a type of conversion disorder. Nowling, 813 F.3d at 113. This diagnosis was accompanied by other diagnoses of obesity, migraine headaches, mood disorder, anxiety disorder, and personality disorder. Id. As the court explained, "[c]onversion disorder is a phenomenon in which a person actually and subjectively experiences symptoms without a known underlying medical cause." Id. at 1113-14. It is believed that the symptoms manifest themselves as a result of an "unconscious, involuntary conversion of mental stress into a physiological symptom." Id. at 1114. A person suffering from conversion disorder "actually believes herself to be experiencing symptoms at a greater

43

level of severity than clinical evidence can support." Id.  Nowling suffered from seizures for which her physicians could not find a physical, objective, neurological basis.  Id.  She described her condition as waxing and waning, and often accompanied by migraine headaches.  Id. at 1116.

Nowling's activities of daily living were much the same as Ms. Swenson's: she did not drive, she did not often go out in public, she watched 60-90 minutes of television daily, she worked on the computer for 15-20 minutes at a time but would have to discontinue doing so because of headaches.  Id.  She took care of her personal needs, did a modest amount of cooking, and yard work "at her own pace."  Id.  The ALJ found Nowling's description of the disabling nature of her impairments to be less than fully credible in large part because there were no objective medical findings supporting those claimed symptoms.  Id. at 1118.  This, the Eighth Circuit said, failed to address "the primary feature of conversion disorder and somatoform symptoms, namely, the extent to which Nowling actually perceived symptoms and the extent to which conversion disorder rather than a lack of credibility might explain the absence of objective medical support for her symptoms."  Id.  The Eighth Circuit remanded to the agency for further consideration.  Id. at 1124.  So, too, here Ms. Swenson's case must be remanded because the ALJ in her case missed the essential nature of her conversion and somatoform symptom disorders.

Ms. Swenson raises an additional issue with regard to the ALJ's formulation of Ms. Swenson's mental RFC—she claims the ALJ misunderstood

Dr. Konrady's opinion.  Dr. Konrady conducted a one-hour interview of

Ms. Swenson and then administered four tests:

- Wechsler Adult Intelligence Scale—IV; this is described as a test developed to assess cognitive ability (intelligence) of adults.  <u>See</u> http://www.statisticssolutions.com, last checked Feb. 12, 2018.

- Wechsler Memory Scale—III; this is a test of visual, auditory, general, and working memory.  <u>See</u> https://www.sciencedirect.com/topics/neuroscience/Wechsler-memory-scale, last checked Feb. 12, 2018.

- Delis-Kaplan Executive Function System; this test is described by the National Institutes of Health Library of Medicine as a test of executive functions, including flexibility of thinking, inhibition, problem solving, planning, impulse control, concept formation, abstract thinking, and creativity.  <u>See</u> https://www.mcbi.nlm.nih.gov/pubmed/16019636, last checked Feb. 12, 2018.

- Test of Validity (TOMM); this is a test designed to detect whether a patient is malingering with cognitive tests of memory.  <u>See</u> https://sciencedirect.com/science/article/pii/S0887617703000787, last checked Feb. 12, 2018.

Ms. Swenson scored in the average and low average range for each of

these tests, which Dr. Konrady indicated showed mild impairment of cognition

and memory.  AR536-43.  Ms. Swenson scored within normal limits on the

TOMM test, indicating she was not malingering.  AR538.  In addition, the

WAIS-IV and the WMS-IV both have validity measures embedded within the

tests and Ms. Swenson did well on those validity measures too.[14]  <u>Id.</u>

_____

[14] The Commissioner suggests in her brief that Dr. Konrady found evidence of malingering because Ms. Swenson completed "some tasks of processing speed slowly and seemed somewhat intentional in her effort to complete tasks slowly or with more care than would be necessary." Docket No. 14 at p. 13 (citing AR538).  However, Dr. Konrady specifically found Ms. Swenson not to be malingering based on the objective results of the TOMM test and the validity measures embedded in the WAIS-IV

Dr. Konrady concluded Ms. Swenson's ability to work was "fair" and that she would need some modifications to her work environment based upon weaknesses identified in the testing. AR543. Dr. Konrady further explained her opinion:

> [Ms. Swenson] has the cognitive ability to be able to be employed in a position that does not require quick response fast paced [sic] completion of tasks. She may struggle with tasks requiring multistep directions or multitasking due to difficulty with speed, yet her accuracy is adequate.
>
> Due to [Ms. Swenson's] anxiety and depression it would be better for her to start off slowly (i.e. reduced hours/day) in a position and monitor her success within employment. However, I defer to her medical providers to determine her physical tolerance of the demands of employment. Her concentration and focus was mostly adequate, yet she struggled with the simultaneous demands of timed completion. Again, her limited mental effort may prevent her from working in a position that would be stressful regarding fast-paced environment or multiple task demands.
>
> It is recommended that [Ms. Swenson] continue to engage in treatment of any mental health concerns, including anxiety and depression and possibly some somatization concerns.

AR543.

Ms. Swenson is correct when she posits these tests administered by Dr. Konrady are to determine cognitive and memory function rather than mental disease or impairment. Dr. Konrady herself made that distinction apparent when she wrote, "the possibility of somatization or conversion disorder must be considered, and behavioral observations made during testing would support, rather than oppose, those concerns." AR543. It is not

---

and WMS-IV tests. AR538. Thus, there is no evidence of exaggeration which would undermine Dr. Konrady's opinion, as the Commisioner suggests in her brief.

altogether evident that the ALJ grasped this distinction.  The ALJ did not incorporate into the mental RFC Dr. Konrady's opinion that Ms. Swenson needed a slow-paced work environment free from timed demands and multiple task demands.

The ALJ gave "partial weight" to Dr. Konrady's opinion, but did not specify which part of Dr. Konrady's opinion was credited and which part was ignored.  AR23.  The ALJ also discounted Dr. Konrady's opinion as "quite vague."  Id.  Certainly the wealth of data from the four tests and the portion of Dr. Konrady's opinion quoted at length above cannot be characterized as "vague."  Because this court is remanding this matter for other issues, the court includes in its remand a specific directive to reconsider Dr. Konrady's opinion in light of the nature of Ms. Swenson's mental impairments and in light of the evidence in the record as a whole.

As to mental RFC, the Commissioner argues in her brief that the ALJ properly considered Ms. Swenson's somatoform symptom disorder and conversion disorder, but that there was no evidence in the record that these conditions imposed any functional limitations.  This argument is not borne out by the record.  As noted above, Dr. Konrady opined as to several functional/occupational limitations imposed by Ms. Swenson's cognition and memory issues.  In addition, Dr. Rhonda Smith conducted psychological testing on Ms. Swenson and opined that Ms. Swenson's primary difficulty would be somatic reactivity under stress.  AR463.  She documented reduced psychological functioning accompanied by anxiety and depression and noted

Ms. Swenson would likely have hysteroid adjustment to life and may experience periods of exacerbated symptom development. Id. Dr. Smith predicted Ms. Swenson would have difficulty managing routine affairs and may have a poor memory and concentration problems. AR464. Dr. Smith also opined Ms. Swenson would be resistant to mental health treatment due to her conditions, instead wanting medical explanations for her symptoms. AR464.

The court rejects the Commissioner's suggestion that there is no evidence in the record that Ms. Swenson's mental impairments impose any functional restrictions. Remand is recommended for the Commissioner to reconsider Ms. Swenson's mental RFC in light of the above discussion.

### b.    Physical RFC

The ALJ found Ms. Swenson had the physical RFC to:

> [P]erform a full range of work at all exertional levels but with the following non-exertional limitations:  the claimant can never climb ropes, ladders or scaffold. [sic] The claimant can frequently handle, finger, and feel bilaterally.  The claimant should never be exposed to unprotected heights, dangerous machinery, or moving mechanical parts.

See AR19. "All exertional levels" includes the heavy and very heavy levels of work. The heavy level of work includes the ability to exert 50 – 100 pounds of force occasionally (up to 1/3 of the work day), and exert 25 – 50 pounds of force frequently (from 1/3 to 2/3 of the workday). Dictionary of Occupational Titles at 1013 (US Dept. of Labor, Dictionary of Occupational Titles, Rev. 4th Ed. 1991). Very heavy work reqires exertion in excess of 100 pounds. Id.

State agency physicians did not render any opinions as to RFC. See AR87, 96, 105, 114. These physicians found Ms. Swenson's post concussive

syndrome to be a medically determinable severe impairment, but opined the effects of that condition would not last for 12 months or more.  See AR86, 95, 103-04, 112-13. [15]

Prior to the hearing, Dr. Knutson rendered an RFC opinion as to the limiting effects of Ms. Swenson's headaches.  AR491-93.  Dr. Knutson stated he had diagnosed Ms. Swenson with post concussive syndrome.  AR491.  Due to this condition, Dr. Knutson stated Ms. Swenson had daily headaches accompanied by vertigo, nausea, malaise, photosensitivity, visual disturbances, mood changes, and mental confusion/inability to concentrate.  Id.  He indicated bright lights, lack of sleep, noise, stress, strong odors, and vigorous exercise all were triggers for Ms. Swenson's headaches.  AR492.  Coughing, bright lights, moving around, and noise made the headaches worse, lying in a dark room with hot packs made them better.  Id.  Dr. Knutson backed up his opinions with positive test results from MRI, CT scan, weight loss, tenderness, and impaired sleep.  Id.  He attributed Ms. Swenson's headaches to her head injury.  Id.  Dr. Knutson said his patient was not a malingerer and that emotional factors did not contribute to her headaches.  AR493.  Ms. Swenson had tried occupational therapy, Cymbalta and Amitriptyline.  Id.  Dr. Knutson's prognosis for Ms. Swenson was "poor."  Id.  He opined her condition would produce good and bad days and that she would miss, on average, more than 4

---

[15] Ms. Swenson's head injury occurred July 6, 2014.  The cited reports were all issued by state agency physicians prior to the one-year anniversary of Ms. Swenson's head injury on July 6, 2015.

work days per month due to her condition.  Id.  "Really not able to work" he

wrote.  Id.

Dr. Jeffrey Boyle, a neurologist, evaluated Ms. Swenson's headaches

using the Headache Impact Test ("HIT") and assigned a score of 75.  AR341.

HIT "was designed to provide a global measure of adverse headache impact and

was developed to use in screening and monitoring patients with headaches in

both clinical practice and research."  See National Institutes of Health, U.S.

Nat'l Library of Medicine,

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3057423/, last checked

02/09/2018.  The HIT measures the adverse impact of headache on social

functioning, role functioning, cognitive functioning and psychological distress.

Id.  Studies and analysis have validated the HIT as a reliable tool for

determining the impact of headaches on patients.  Id.  HIT scores range from

36 on the lowest end to 78 on the highest end.  Id.  Thus, although Dr. Boyle

did not prepare a formal function report, the HIT score is one way of measuring

the impact of headaches on one's functioning.

Dr. Knutson also rendered a medical source statement after the ALJ

hearing which was submitted to the Appeals Council when Ms. Swenson

requested review by that body.  See AR546.  The Commissioner concedes it is

appropriate for this court to consider Dr. Knutson's post-hearing opinion

evidence.  See Docket No. 14, Commissioner's brief at p. 16.  The law supports

this concession.

50

If the Appeals Council considered the new evidence and declined to grant review, the district court does not evaluate the Appeals Council's decision not to review.  Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).  Rather, when the Appeals Council declines review, the ALJ's decision becomes the final decision of the Commissioner.  Mackey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995).  Even if the Appeals Council denies review, the evidence submitted to it becomes part of the administrative record.  Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992).  If the Appeals Council considered the new evidence but nonetheless declined to review, then the task for the reviewing court is to consider whether the ALJ's decision is supported by substantial evidence in the record as a whole, *including* the new evidence that was not before the ALJ.  Cunningham, 222 F.3d at 500; Mackey, 47 F.3d at 952; Riley, 18 F.3d at 622; Nelson, 966 F.2d at 366; Browning, 958 F.2d at 822-23.  To an extent, this requires the court to speculate as to "how the administrative law judge would have weighed the newly submitted reports if they had been available in the original hearing." Riley, 18 F.3d at 622.

Dr. Knutson's post-hearing opinion concerned Ms. Swenson's ability to lift and use her hands.  AR546.  Dr. Knutson opined Ms. Swenson had a medical condition that limited her ability to use her hands to seize, hold, grasp, turn or otherwise work with them and to pick, pinch, or otherwise work primarily with her fingers.  Id.  In Dr. Knutson's opinion, Ms. Swenson could handle with her hands less than frequently (less than up to 2/3 of the day).  Id.

She could engage in fingering less than frequently.  Id.  Dr. Knutson also stated

Ms. Swenson's medical conditions limited her to lifting less than 50 pounds.

Id.  He also stated she could lift 25 pounds less than frequently.  Id.

The Commissioner acknowledges certain objective medical findings

regarding Ms. Swenson's ability to handle and finger with her hands, which

were noted by the ALJ.  See Docket No. 14 at p. 15.  For example, a November,

2014, x-ray showed "marginal erosions" of the left third and right fourth

metacarpophalangeal joints.  AR22, 385.  Ms. Swenson has rheumatoid

arthritis.  AR22, 507.  And Dr. Boyle documented a 50-percent loss of "enteric

sensation" in Ms. Swenson's right hand.  AR20, 343.  Because other tests were

normal (gait, strength, coordination, limb ataxia, standing from a chair, upper

extremity sensation and strength normal), the Commissioner would have this

court believe that these abnormal objective findings do not translate into any

functional limitations.  See Docket No. 14 at p. 14.

The court does not know what "enteric sensation" means, as Dr. Boyle

noted in August, 2014.  AR343.  Neither party explains that term to the court.

However, Dr. Boyle also wrote that Ms. Swenson had "a 50% decrement of

pinprick sensation" in her right hand.  AR341.  Thus, it appears to this court

that Ms. Swenson's right hand was 50-percent devoid of sensation to

pinpricks—in layman's terms, her right hand was 50-percent "numb."  The ALJ

never explains how a right-hand dominant person with a 50% numb right hand

can use that hand to pick up and carry 50 pounds, or how one with such a

hand can seize, hold, grasp, turn, pick, pinch, or otherwise work primarily with

one's fingers for up to 2/3 of an 8-hour workday, day in and day out for months. The ALJ does not satisfy her burden by simply *noting* the adverse objective medical findings. She must show how that medical evidence supports her RFC. Here, the ALJ noted relevant evidence bearing adversely on Ms. Swenson's use of her hands, but never translates how that evidence impacts Ms. Swenson's functioning. Dr. Knutson and Dr. Boyle's evidence concering this issue are directly on point and undermine the ALJ's conclusion that Ms. Swenson can use her hands to grasp and finger 2/3 of the day and lift 50 pounds 1/3 of the day.

The metacarpophalangeal joints are what laymen would call one's knuckles. They are the joints between the fingers (phalanges) and the bones of the palm/hand proper (metacarpals). See https://ncbi.nlm.nih.gov/pubmedhealth/PMHT0023110/, last checked 02/09/2018. The ALJ never explains how the erosion of the knuckle joints in Ms. Swenson's hands affect her ability to use her hands. The only opinion in the record concerning Ms. Swenson's function related to her hands is Dr. Knutson's.[16] AR546.

---

[16] The Commissioner suggests that Dr. Knutson's post-hearing opinion is not supported by the record as a whole because of "the unremarkable objective evidence" of normal functioning. See Docket No. 14 at p. 16. However, the "objective evidence" to which the Commissioner refers is the "normal" findings as to gait, strength, coordination, limb ataxia, standing from a chair, upper extremity sensation and strength discussed, *supra*. None of these findings is specific as to what function Ms. Swenson has in her hands, which was the subject of Dr. Knutson's post-hearing opinion.

Finally, Ms. Swenson has been diagnosed with rheumatoid arthritis, but the ALJ similarly never discusses how that condition impacts her RFC. Apparently, the ALJ dismissed this condition as a potentially limiting factor because it was "stable." AR22. However, a condition may be terrible and impact one's functioning to a great degree, but so long as it is not changing, it could fairly be described as "stable."

Before this court, the Commissioner argues that Ms. Swenson's daily activities support the ALJ's physical RFC. Specifically as to the use of her hands, the Commissioner argues Ms. Swenson dresses herself, prepares meals, dusts, does laundry, and shops. Docket No. 14 at p. 15. These activities, assert the Commissioner, show that Ms. Swenson can perform handling and fingering with her hands. Id. True to an extent, but there is nothing in the record showing Ms. Swenson engages in any of these activities for 2/3 of the day, five days a week, month after month—as is required to support the ALJ's RFC formulation. Reed, 399 F.3d at 923; Juszczyk, 542 F.3d at 633; SSR 96-8p. None of these activities involved lifting 50 pounds.

The pages of the administrative record cited to by the Commissioner in support of her "daily activities" argument also belie the point. Ms. Swenson describes cooking things she can prepare in stages so she can lie down between stages, or merely eating canned goods or frozen pizza. AR257. Although she stated she dusts and does laundry, how long it takes depends on how bad the pain is and how numb her hands and feet are. Id. She dresses herself, but again, that takes only minutes per day, not 2/3 of the day. AR256.

54

None of these activities of daily living support the ALJ's formulation of Ms. Swenson's RFC.

Finally, as noted above, the ALJ did not discuss Ms. Swenson's diagnoses of post concussive syndrome and headaches in determining what limitations, if any, they imposed on her physical RFC.  Ms. Swenson testified physical activity causes or makes her headaches worse.  AR63.  Dr. Knutson opined the same.  AR492.  Dr. Boyle rated Ms. Swenson's headaches a 75 on a 78-point scale, using a tool the accuracy of which has been tested and validated.  AR341.

It is the ALJ's exclusive province to determine RFC, but that determination must be based on some evidence in the record, including some medical evidence.  Lauer, 245 F.3d at 703.  The state agency physicians gave no opinions about RFC.  Dr. Knutson and Dr. Boyle, as well as Ms. Swenson herself, placed evidence in the record concering the impact her impairments have on her physical functioning.  The ALJ's formulation of Ms. Swenson's physical RFC bears no relation to any of these sources.  The court is at a loss to determine what evidence supports the ALJ's decision.  The conclusion that Ms. Swenson's physical RFC is not supported by substantial evidence in the record is clear.  For this reason, this court respectfully recommends this matter be remanded to allow the Commissioner to reconsider Ms. Swenson's RFC in light of her medical impairments and the record as a whole.

**F.     Did the ALJ Err in Evaluating Ms. Swenson's Credibility?**

The last issue raised by Ms. Swenson is whether the ALJ erred in finding her testimony not fully credible that her combination of impairments was disabling.  The Commissioner argues the ALJ properly evaluated Ms. Swenson's credibility and found it lacking because she failed to accept medical recommendations for trigger point injections and for an eyegraine study.

The analysis of this issue begins with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  "When an ALJ reviews a claimant's subjective allegations . . . and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in Polaski[17] and apply those factors to the individual."  Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).

In determining whether to fully credit a claimant's subjective complaints, an ALJ must consider several factors, including:  whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration,

---

[17] Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  A claimant's subjective complaints may be discredited only if they are inconsistent with the evidence as a whole.  Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original).  Although activities which are inconsistent with a claimant's testimony of a disabling condition reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

In the Wagner case, the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where Wagner had engaged in extensive daily activities, as evidenced by his "Daily Activities Questionnaire" and his testimony at the hearing, and where his testimony as to the limiting effect of his pain was inconsistent with the medical record because his records

57

reflected that he did not pursue ongoing evaluation or treatment for his pain and he did not seek or take pain medication on a regular basis.  Wagner, 499 F.3d at 852-853.  See also Baker v. Barnhart, 457 F.3d 882, 892-894 (8th Cir. 2006) (affirming ALJ's discrediting of claimant's subjective complaints of pain where claimant engaged in a significant amount of activities of daily living--full self-care, driving a car, shopping, and running errands--a medical source opined that the claimant engaged in symptom exaggeration, the claimant did not take pain medication, and the absence of an etiology for the alleged pain).

In Bentley v. Shalala, 52 F3d 784, 785-786 (8th Cir. 1995), the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where the claimant had not sought medical treatment for his pain for a long period of time and was not taking any prescription medication for pain.  In addition, the record reflected that the claimant had applied for a number of jobs during his claimed disability period.  Id.

In Harvey v. Barnhart, 368 F.3d 1013, 1015-16 (8th Cir. 2004), an ALJ who discredited the claimant's testimony as to limitations on his activities was affirmed where the evidence showed the claimant had made prior inconsistent statements to his physicians regarding his limitations and his asserted need to use crutches or a non-prescribed walker was inconsistent with statements made by the claimant on other occasions.

In Guilliams, 393 F.3d at 802-803, the Eighth Circuit affirmed an ALJ's discrediting of the claimant's subjective complaints of back pain where claimant used a cane, but no medical prescription for the cane existed; where

several medical exams revealed the claimant to be in no significant distress; where MRIs of the spine revealed essentially normal findings; where the claimant's muscle mass was not atrophied despite his allegation of restriction of motion and diminishment of strength; where the claimant declined to follow medical advice regarding treatment of his pain; and where medical evidence demonstrated that pain medication alleviated the claimant's symptoms of pain.

In Dolph v. Barnhart, 308 F.3d 876, 879-880 (8th Cir. 2002), the ALJ's discrediting of the claimant's subjective complaints of pain from kidney disease and degenerative spine disease was affirmed where the claimant's records of her kidney disease showed "consistently stable renal function" and there was no record support for "complaints of ongoing, severe, protracted discomfort."

In the Nowling case, discussed above, the ALJ found Nowling partially credible in that her condition existed, but the ALJ found non-credible Nowling's testimony regarding the disabling effects of her condition. Nowling, 813 F.3d at 1120. The Eighth Circuit remanded because the ALJ, in evaluating the claimant's testimony, failed to take into account the evidence in the record as a whole which supported the claimant's testimony and the nature of the claimant's condition itself. Id. at 1120-23. It is the above body of law this court applies to the review of the record in this case.

This case closely resembles the facts in Nowling. The ALJ found that Ms. Swenson's impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent

59

with the *medical evidence* and other evidence in the record." AR22. The ALJ

then went on to describe "normal" neurologic findings, normal functional

mental status, normal attention span and concentration, accurate recall,

adequate memory, average cognitive abilities and no signs of difficulty in

ordering her thoughts. Id. Thus, the ALJ concluded, "the medical evidence

suggests the claiamnt's impairments are not as debilitating as alleged." Id.

This is the same error made by the Nowling ALJ in failing to understand the

nature of conversion disorder and it is the same mistake Ms. Swenson's ALJ

made in arriving at her mental RFC. The failure by the ALJ to understand the

very nature of the mental impairments she found to be severe warrants remand

as to the finding of Ms. Swenson's credibility.

The Commissioner points to Ms. Swenson's rejection of Dr. Boyle's

suggestion that she undergo an eyegraine evaluation and trigger point

injections for her headaches. See Docket No. 14 at p. 21. Ms. Swenson argues

she had good reasons for declining to undergo these treatments. On remand,

the ALJ should consider both the treatments Ms. Swenson declined as well as

her reasons for doing so. The Nowling court stated:

> Given this disconnect [between medical verification and reported
> symptoms], an obvious difficulty arises when it becomes necessary
> to make credibility assessments in cases involving somatoform
> phenomena. Subjective perceptions of somatoform effects may, in
> fact, be debilitating even when clinical or diagnostic medical
> evidence does not fully support the claimed symptoms. It
> nevertheless remains necessary to make credibility assessments in
> these settings, and "[i]n cases involving somatoform disorder . . .
> an ALJ is not free to reject subjective experiences without an
> express finding that the claimant's testimony is not credible."

Nowling, 813 F.3d at 1114 (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)).

This court is remanding as to the issue of Ms. Swenson's credibility *not* because there are no grounds in the record for discounting Ms. Swenson's report of her symptoms and their disabling effect, but rather because the ALJ misconstrued the nature of her mental impairments.  The absence of confirming medical findings is a necessary aspect of the diagnosis of these mental impairments, not evidence that the mental impairments do not exist. As with formulating Ms. Swenson's RFC, the ALJ erred in misconstruing the very nature of Ms. Swenson's mental impairments in evaluating her credibility. The ALJ also ignored Polaski factors which support Ms. Swenson's testimony, such as the frequency with which she has sought medical treatment and the fact she has taken daily and sometimes twice daily pain medication for several years.  All the Polaski factors should be considered on remand in light of the nature of Ms. Swenson's impairments.

## G.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Swenson requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security

Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir.

62

2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

### CONCLUSION

Based on the foregoing law, administrative record, and analysis, this magistrate judge hereby respectfully RECOMMENDS that plaintiff Christi Le Swenson's motion for summary judgment [Docket No. 11] be granted and the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

### NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED February 15, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge